## Williamson *v.* State

No. 40242          November 19, 1956          90 So. 2d 657

*Howard Pigford, Lester F. Williamson, Thos. L. Goldman,* Meridian, for appellant.

*John H. Price, Jr., Asst. Atty. Gen.,* Jackson, for appellee.

McGEHEE, C. J.

The defendant in the trial court, Thomas Williamson, was convicted of grand larceny upon the theory that he had stolen and carried away the sum of $140, which he was alleged to have taken from the person of the chief prosecuting witness, Will Underwood, on November 23, 1955.

The case of the prosecution rested entirely on circumstantial evidence. The defendant asked for, and was refused, a peremptory instruction which sought to direct the jury to return a verdict in his favor. In his motion for a new trial the defendant assigned as one of the grounds therefor that the court was in error in refusing to grant unto him the peremptory instruction requested. The third assignment of error on this appeal is the action of the trial court in overruling the defendant's motion for a new trial on the above mentioned and other grounds. But in view of the conclusion that we have reached after a careful examination and study of the testimony, it is only necessary that we deal with this third assignment of error.

The proof disclosed that the defendant, who was employed as a graduate nurse at the East Mississippi Insane Hospital, at Meridian, on November 22, 1955, cashed a check in the sum of $200 at a bank in Meridian; and after getting off from work that afternoon about 4 o'clock, he purchased a portable television set and carried it to the home of Jeff Smith, near Quitman in Clarke County, and had the same installed there, since he and his

brother-in-law, the said Jeff Smith, had purchased the property where Smith lived as joint owners; that the defendant remained at the place where Jeff Smith lived, watching the television until 10:30 or 11 o'clock on the night of November 22, 1955; that he then decided to go to the mill of the Long Bell Lumber Company, at Quitman, where the chief prosecuting witness, Will Underwood, and John Kelly and Jeff Smith were on duty as employees of the said lumber company; that he remained about the mill, where the four of them were engaged in conversation, about one thing and another, until 2:30 or 3:00 a. m. of November 23, 1955; and that before the defendant left the mill, the said Will Underwood, who claimed that his billfold containing the $140 had been removed from a zipper pocket in his overalls, couldn't walk and was staggering about in the room where the four men had been engaged in conversation.

The chief State witness, Underwood, admitted in his testimony at the trial that he couldn't walk well and was staggering before he left the mill. Both John Kelly and Jeff Smith were also introduced as witnesses for the State. John Kelly testified that he was about his duties as night watchman and that he did not see Underwood drink any of the moonshine whiskey that Underwood admitted having tasted, and which the defendant testified had been consumed in considerable quantity by Underwood prior to the time he was staggering about the place where the four men had been engaged in conversation. The State witness Smith corroborated both Underwood and the defendant to the effect that Underwood couldn't walk well and was staggering about the premises. But John Kelly testified that in his opinion Underwood appeared to be sober when he saw him after making his rounds on the hour as night watchman.

The proof further discloses that shortly before Underwood left the premises, between 2:30 and 3:00 a. m., on November 23, 1955, the defendant left the group of men

and went to a place nearby whereby he purchased four bottles of coca-cola, one of which was drunk by Underwood, one by Jeff Smith, and one by the defendant, with the remaining bottle left on the table for the night watchman to drink upon his return to the place in the mill where they all had been engaged in conversation. .

It is the theory of the chief witness, Underwood, that his bottle of coca-cola had been "doped", and he testified when the defendant returned with the four bottles of coca-cola, the bottle cap had been removed from one of them and that the bottle cap had been almost removed from another one; that the witness, Underwood, drank from the bottle of coca-cola from which the cap had been removed, and that immediately thereafter his eyes began burning, he felt funny, couldn't walk well and was staggering. Kelly was not present at that time, and one of the bottles was sitting on the table for him to drink upon his return upon one of his rounds as night watchman.

However, both the State witness, Jeff Smith, and the defendant testified that the chief witness, Underwood, was staggering about the boiler room in the mill before the defendant ever went off to buy the coca-colas. The defendant testified that Underwood had taken several drinks of the moonshine whiskey, but the latter claimed that he only drank about a teaspoonful thereof. The defendant further testified that after he saw Underwood take several drinks out by the car, the latter left the place where they all had been engaged in conversation and on two occasions went on the outside, and that the defendant found that almost all of the whiskey had been consumed and that the defendant had only drunk about two swallows of it; that originally there were one full pint and part of another one.

The State witness, Jeff Smith, had left the place where they had been engaged in conversation and went on the outside, but he testified that he did not drink any of the

whiskey at all, and the State witness Kelly said that he did not drink any of it and did not see anyone else drink any of it. Kelly testified that about 2:30 a. m., he got up from where they were all seated and announced that he was leaving to go home; that thereupon both the chief witness, Underwood, and the defendant took out their watches and stated what they showed to be the time of night; that then either Underwood or the defendant stated that the others' watch was wrong as to the time; that Underwood took out his billfold from his zipper pocket, placed it on the table, and stated to the defendant, ''I'll bet you fifty dollars that your watch is wrong;'' that he didn't see the money, but it was a fat billfold; and that the defendant then stated, ''I am not a betting man,'' and sat back down; and that then Underwood picked up the billfold and put it back into the zipper pocket of his overalls.

The State witness Kelly testified that soon thereafter he looked on the outside, saw the defendant getting in his car, that backed up, and then drove about a hundred yards and then returned to the mill; and that he later saw Underwood and the defendant sitting on the side of the road there at the mill, talking. He did not testify that he saw Underwood and the defendant get in the latter's car, if they did do so.

The chief witness Underwood testified that previously the defendant got hold of him ''and shoved me around there in the boiler room some. He says, 'Maybe I can help you around some, maybe you will get over it.' * * * I couldn't walk; I was staggering. He said he was going to take me out to the car and ride around a little over the plant; he wouldn't take me off the plant. Going on out there, I told him I couldn't leave Jeff by himself, wasn't nobody else there, * * *. He says, 'Jeff knows you are going,' so when we got to the car, he had me hugged up, using his knees, walking with me, helping me along that way. So we got out to the car, and I thought it was my

boy's car, when I first got there. He started putting me in it. * * * Says, 'You will fall, get hurt.'* * * Well, he put me in, helped me in there. I couldn't get in there, I was nearly limber. So I don't remember nothing else until we were coming through town (the Town of Quitman); and he asks me, he says, 'Mr. Underwood, don' talk,' he says, 'We are in town,' says, 'They will put us in jail.' Says, 'We don't want to sleep in jail tonight.' Well, we were just a little bit further, I reckon, and I said something else. He shook me again, says, 'Mr. Underwood, I am taking you home. I will take you home in a few minutes, if you will hush; don't, they will put us in jail.' Well, I went to sleep then, when he told me that. That is the last thing I remember. Next thing I remembered, I was down here in the woods. I didn't know where I was at. Down here at Archusa Springs.. * * *."

The State witness Smith and the defendant both testified that while they were in the boiler room, at the place where they had been engaged in conversation, Underwood was staggering around and that they were fearful that he would fall in a chain there and get hurt and they both agreed that he should be given a cup of coffee, and the witness Smith testified that he did fix him a cup of coffee and that this all occurred before the defendant went off to buy the coca-colas.

The defendant denied that Underwood was ever in his car that night, and neither of the State witnesses other than Underwood, claimed to have seen Underwood in the car with the defendant. And the defendant claims that he got in his car alone and went on home.

The chief witness Underwood testified that he didn't "come to himself" until shortly before he saw Albert Smith at or near Archusa Springs about 3:00 o'clock p. m. on November 23, 1955, which was approximately twelve hours after Underwood is claimed to have left the mill.

On cross-examination Underwood was asked: "Q. Now, when this Alfred Smith was down at Archusa Springs, where you stayed from three o'clock in the morning until three o'clock in the afternoon, a total of approximately twelve hours, wasn't the Negroes down there, including Negro men and women, and also other people there, when Alfred Smith saw you. A. No, if there was, I don't know who was there. Q. Well, you saw other people around there, didn't you? A. I seen somebody, flocks of them, but I couldn't tell who they were. Q. Well, were you asleep or awake, or what were you doing down there when all those people were milling around? A. Well, I was under the influence of that old dope. Q. Well, how do you know they didn't get your money? A. Didn't anybody ever get up to me. Q. How do you know that, if you were under the influence of something? A. Well, you know a heap of things when you are that way. Q. Well, you know what you were doing then? A. No, I don't know all the time what I am doing. Q. And you don't know who got your money? A. I just telling you my opinion about the money, if you want to know. I think he (meaning the defendant) got my money before I left the plant. He had me here juggling me around that way, and that is when I think I lost my money. Q. You knew what was going on then? You didn't see any money missing from you, did you. A. I didn't know what ailed me. I never had been doped before. * * * Well, why did you tell your boy that you had left your money with your wife? A. When you are doped up, you are liable to tell anything. Q. Well, you didn't see your boy while you were doped up, did you? A. Well, you know, I just thought maybe I could do it, (meaning he thought, that he could have given it to his wife). I didn't know whether I could or not. Q. But you want these fellows (meaning the jurors) to say he had it when you don't know yourself what happened to your money. A. I knowed I had

my money when I was up there at the mill, for I bet on it up there.''

The chief witness Underwood further testified on direct examination that when the defendant gave him the bottle of coca-cola he handed the witness the opener, but on cross-examination he testified otherwise.

The person who sold the coca-colas to the defendant testified that he gave him an opener to take with him. Both the State witness Smith and the defendant testified that they each opened their own bottle of coca-cola and that Underwood open his own.

The defendant had attended medical school for two years, was a graduate nurse, and was holding a responsible position at the East Mississippi Insane Hospital at the time of the commission of the alleged crime. Several witnesses testified as to his good reputation for honesty and integrity, and no one testified to the contrary as to this reputation. He had been injured by an explosion on an aircraft carrier while in the military service, when thirteen men were killed by the explosion. At that time he sustained a back injury, and his physician testified that he had prescribed for a medicine which was both '' a pain-killer and stimulant,'' called Hyson. A pharmacist testified to having filled this prescription for the doctor, and at the time of the defendant's arrest he had two bottles on his person and three other bottles in his suitcase, one of which contained aureomycin. A local doctor at Quitman testified that Underwood was in a state of apathy at the time he saw him during the afternoon of November 23, 1955, and that this condition could be caused either by '' a drug or whiskey, one or the other.''

The chief witness does not claim to have been conscious of any one unzipping his overalls pocket and removing his billfold therefrom whenever it may have been removed. While he couldn't walk well and was staggering, he claims to have known what was going on until he

went to sleep after passing through the Town of Quitman. If he did know what was going on before he left the mill, then he should have known whether the defendant unzipped his pocket and removed his billfold at the time he said the defendant had him ''hugged up'' and was ''juggling'' him around before he left the mill. He was only willing to say that he ''believed'' that the defendant got his billfold.

In fact, it is a reasonable hypothesis that he may have lost his billfold during the nearly twelve hours thereafter during which he didn't know anything. He did not miss it until during the afternoon of November 23, 1955, when he felt for it to see about employing some one to get him out of the woods and back to the Town of Quitman.

The proof is insufficient to show that either the defendant or anyone else actually stole Underwood's billfold from his person, and he didn't even remember whether or not he had given his money to his wife, and so stated such a theory to his son, after he ''came to himself.'' His wife accompanied him to the local doctor that afternoon, but it is not clear from his testimony as to the hour when he made the above-mentioned statement to his son in the presence of Alfred Smith. Moreover, there is no testimony that the defendant had any bottles of medicine with him down at Quitman on the night of November 22, 1955, and it was two days or more later before any was found on his person or in his suitcases.

██ ██ We do not feel justified in upholding a conviction and a sentence to the state penitentiary for the crime of grand larceny in the light of the testimony herein before reviewed. ██ ██ When a case is based on purely circumstantial evidence the proof must be sufficient not only to convince the jury beyond a reasonable doubt of the guilt of the accused, but they must be so convinced to the exclusion of every other reasonable hypothesis consistent with his innocence. Obviously there are a number of other reasonable hypotheses as to what

may have become of the billfold in question in the instant case. We think that the defendant was entitled to the peremptory instruction in his favor as requested.

Reversed, and appellant discharged.

*Hall, Lee, Kyle* and *Holmes,* JJ., concur.